### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| IN RE MANPOWER OF LANSING, MI, INC., DATA BREACH LITIGATION | Master File No. 1:25-cv-956-PLM-PJG |
| This Document Relates to: All Actions | |

### CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Mary Brooks, Sara Conrad, Christine Cooper, Fredrick Cooper, Amy Doublin, Deanna Ghinelli, Shanna Harmon, Courtney Howard, Lorna Lane, Latoya Middleton, and Christopher Platter (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, through undersigned counsel, bring this Consolidated Class Action against Defendant Manpower of Lansing, Michigan, Inc. ("Defendant" or "Manpower") and allege, upon personal knowledge as to their own actions and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      Plaintiffs bring this class action lawsuit against Manpower for its failure to properly secure and safeguard Plaintiffs' and other similarly situated current and former job applicants and employees' ("Class Members") personally identifiable information ("PII") from hackers.

2.      Defendant is a franchise of one of the world's largest staffing companies and is part of ManpowerGroup, a multinational corporation with over 600,000 workers in more than 2,700 offices serving over 100,000 clients worldwide, with reported revenues of $17.9 billion in 2024.

3.     Between December 29, 2024, and January 12, 2025, Defendant suffered a ransomware attack in which unauthorized actors gained access to its network systems and exfiltrated files containing the PII of approximately 144,189 individuals (the "Data Breach").

4.     The PII stolen in the Data Breach included Plaintiffs' and Class Members' names, driver's license numbers, and Social Security numbers.

5.     The Data Breach was perpetrated by the RansomHub ransomware group, which targeted the PII and subsequently claimed responsibility for the attack and threatened to release the stolen data unless a ransom was paid.

6.     Despite discovering the incident on January 20, 2025, Defendant did not complete its investigation until July 28, 2025—over six months after the breach occurred, and it did not begin notifying affected individuals until August 11, 2025—almost seven months after the Data Breach.

7.     Plaintiffs and Class Members now face a substantial and imminent risk of identity theft, financial fraud, unauthorized account access, and other personal, social, and financial harms that may persist for the rest of their lives.

8.     Manpower has provided no assurance that all copies of the stolen data have been recovered or destroyed, nor that its data security measures have been sufficiently strengthened to prevent future breaches.

9.     Plaintiffs and Class Members therefore suffer, and continue to face, ascertainable losses, including heightened risk of identity theft, out-of-pocket mitigation costs, lost time, and diminished value of their PII.

10.     Plaintiffs seek redress for Manpower's inadequate safeguarding of Class Members' PII.

11.     Manpower failed to implement reasonable security measures commensurate with the sensitivity of the data it held, particularly given that it operates its own data platform.

12.     Had adequate safeguards been in place, Manpower would have prevented—and detected far earlier—the unauthorized access by ransomware actors.

13.     Because of Manpower's negligent and reckless misconduct, and Plaintiffs and Class Members now face an ever increasing risk of fraud and identity theft.

14.     Plaintiffs bring this action to seek redress on behalf of themselves and all similarly situated individuals whose PII was exfiltrated during the Data Breach.

## PARTIES

16.     Plaintiff Mary Brooks is, and at all times relevant hereto was, a resident and citizen of Michigan.

17.     Plaintiff Sara Conrad is, and at all times relevant hereto was, a resident and citizen of Michigan.

18.     Plaintiff Christine Cooper is, and at all times relevant hereto was, a resident and citizen of Michigan.

19.     Plaintiff Fredrick Cooper is, and at all times relevant hereto was, a resident and citizen of Michigan.

20.     Plaintiff Amy Doublin is, and at all times relevant hereto was, a resident and citizen of Indiana.

21.     Plaintiff Deanna Ghinelli is, and at all times relevant hereto was, a resident and citizen of Michigan.

22.     Plaintiff Shanna Harmon is, and at all times relevant hereto was, a resident and citizen of Michigan.

23.     Plaintiff Courtney Howard is, and at all times relevant hereto was, a resident and citizen of Michigan.

24.     Plaintiff Lorna Lane is, and at all times relevant hereto was, a resident and citizen of Michigan.

25.     Plaintiff Latoya Middleton is, and at all times relevant hereto was, a resident and citizen of Michigan.

26.     Plaintiff Christopher Platter is, and at all times relevant hereto was, a resident and citizen of Indiana.

27.     Defendant Manpower of Lansing, MI, Inc. is a Michigan corporation with its headquarters and principal place of business located at 741 N Cedar St., Suite 200, Lansing, Michigan 48906.

## JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is 144,189, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship, including Plaintiffs Doublin and Platter. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

29.     This Court has general personal jurisdiction over Defendant because it is a Michigan corporation with its principal place of business located in Michigan.

30.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant is subject to the Court's personal jurisdiction with respect to this action.

## COMMON FACTUAL ALLEGATIONS

### A.  Defendant Collected, Maintained and Stored PII.

31.     Defendant is a staffing agency that connects individuals with employers, requiring extensive collection of personal and financial information from individuals seeking employment placement services and from its customers.

32.     In the course of its business operations, Defendant requires job applicants, temporary workers, placement candidates, and other clients to submit extensive sensitive personal and financial information as a condition of receiving staffing services, including information necessary for employment verification, background checks, payroll processing, and compliance with federal and state employment laws.

33.     Specifically, individuals are required to provide their PII and other sensitive information for employment placement and staffing purposes, including but not limited to their names, addresses, Social Security numbers, dates of birth, driver's license numbers, passport numbers, employment history, educational background, professional references, and banking information for payroll purposes. Upon information and good faith belief, individuals seeking employment through Manpower are also required to submit medical test results, including for highly sensitive health conditions.

34.     By collecting and storing this information, Defendant assumed a duty to securely maintain and protect the PII of individuals who had no choice but to provide this information as a mandatory condition of seeking employment and staffing services from Defendant.

35.     The PII that Defendant maintains is particularly sensitive and valuable, containing the complete identity profiles necessary for financial fraud, tax fraud, and synthetic identity theft,

making Manpower an attractive target for ransomware groups seeking to obtain and monetize personal data.

36.     Defendant acknowledges through its privacy notices and communications its obligation to protect personal information and comply with applicable privacy laws and regulations, including those governing the protection of employee and applicant data.

37.     Plaintiffs and Class Members, as current and former job seekers, employees, and temporary workers, whose relationships with Manpower required them to provide PII, relied on Defendant to implement and maintain reasonable and adequate security measures to keep their PII secure and protected from unauthorized access.

**B.  Defendant's Data Breach Exposed PII.**

38.     Defendant derives substantial economic benefit from its staffing operations, which require collecting and storing Plaintiffs and Class Members' PII as a necessary part of the employment placement and staffing processes.

39.     By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting the PII from disclosure.

40.     In Defendant's data breach notification letter (the "Data Breach Notice"), Defendant admitted that between December 29, 2024 and January 12, 2025, Defendant suffered a ransomware attack when unauthorized actors gained access to its network systems.[1]

41.     The incident was discovered by Defendant on January 20, 2025, weeks after it occurred, when investigating an IT systems outage at its Lansing, Michigan franchise office.

---

[1] Examples of Defendant's Data Breach Notice to Plaintiffs in this matter are attached as Exhibit A.

42.    The unauthorized actors accessed and exfiltrated files containing the PII of 144,189 individuals.

43.    On January 22, 2025, the ransomware cybercriminal group RansomHub claimed credit for the breach, allegedly exfiltrating 500 gigabytes of data.[2]

44.    According to RansomHub, the data included "personal and corporate data (passport scans, IDs, SSNs, addresses, contact information, test results, and other data), years of corporate correspondence, financial statements, HR data analytics, as well as confidential contracts and non-disclosure agreements."[3]

45.    RansomHub ransomware group is a ransomware-as-a-service (RaaS) operation that has claimed responsibility for attacks on over 200 critical infrastructure organizations in the United States.[4]

46.    RansomHub posted information about the Manpower breach on its dark web leak site after the Data Breach occurred.

47.    According to the joint cybersecurity advisory, RansomHub was first identified in February 2024.[5] At the time of the advisory, RansomHub had "encrypted and exfiltrated data from at least 210 victims representing the water and wastewater, information technology, government services and facilities, healthcare and public health, emergency services, food and agriculture,

---

[2] https://x.com/H4ckmanac/status/1882130753011786179 (last accessed Nov. 25, 2025).
[3] Sergiu Gatlan, *Manpower discloses data breach affecting nearly 145,000 people*, BLEEPING COMPUTER (Aug. 12, 2025), https://www.bleepingcomputer.com/news/security/manpower-staffing-agency-discloses-data-breach-after-attack-claimed-by-ransomhub/ (last accessed Nov. 25, 2025).
[4] *See* Deeba Ahmed, *Manpower Data Breach Hits 144K, Workday Confirms 3rd-Party CRM Hack*, (Aug. 18, 2025), https://hackread.com/manpower-data-breach-workday-3rd-party-crm-hack/ (last accessed Nov. 25, 2025).
[5] #Stop Ransomware: RansomHub Ransomware, *available at* https://www.cisa.gov/news-events/cybersecurity-advisories/aa24-242a (last accessed Nov. 25, 2025).

financial services, commercial facilities, critical manufacturing, transportation, and communications critical infrastructure sectors."[6]

48.    The advisory urges companies to take mitigation measures that include but are not limited to "implement[ing] a recovery plan to maintain and retain multiple copies of sensitive or proprietary data and servers in a physically separate, segmented, and secure location (i.e., hard drive, storage device, the cloud)," "[r]equir[ing] all accounts with password logins (e.g., service accounts, admin accounts, and domain admin accounts) to comply with National Institute for Standards and Technology (NIST) standards for developing and managing password policies," and "segment[ing] networks."[7]

49.    Defendant failed to implement any of the advisor's recommendations or other adequate security measures to protect against ransomware attacks.

50.    Defendant could have prevented this Data Breach by implementing reasonable security protocols, encrypting the PII in its possession, maintaining adequate monitoring systems, and following industry-standard security practices for ransomware prevention.

51.    Indeed, in the Data Breach Notices, Defendant effectively acknowledges that it could have had enhanced security protocols prior to the breach as it stated that, after the breach, it implemented "enhanced security measures to help prevent a similar incident from occurring" again.[8]

52.    As a result of Defendant's failures, a cybercriminal group accessed and stole files containing the PII of Plaintiffs and Class Members from Defendant's possession.

---

[6] *Id.*
[7] *Id.*
[8] *See* Defendant's Data Breach Notice(s), attached as Exhibit A.

53.    Despite discovering the breach on January 20, 2025, Defendant took over seven months to notify affected individuals, with notification letters being sent on or about August 11, 2025.

54.    The lengthy delay in notification severely hampered victims' ability to take timely protective measures against identity theft and fraud.

**C.  Defendant Knew or Should Have Known of the Risk Because Institutions in Possession of PII.**

55.    Given that Defendant was storing the PII of Plaintiffs and Class Members and knew or should have known of the serious risk and harm caused by a data breach, Defendant was obligated to implement reasonable measures to prevent and detect cyber-attacks, such as those recommended by the Federal Trade Commission (the "FTC") and promoted by data security experts and other agencies.

56.    That obligation stems from the foreseeable risk of a data breach given that Defendant collected, stored, and had access to a wealth of highly sensitive personal records and data and, additionally, because other highly publicized data breaches put Defendant on notice that the personal and sensitive data it stores might be targeted by cybercriminals.

57.    Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation and United States Secret Service have issued warnings to potential targets, so they are aware of, and prepared for, a potential attack.

58.    Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and therefore to anyone in Defendant's industry, including Defendant.

59.     Despite the abundance and availability of information regarding cybersecurity best practices and the prevalence of data breaches, Defendant inexplicably failed to adopt sufficient data security processes by, without limitation:

a.  Failing  to  properly  implement  adequate  access  controls  and monitoring systems;

b.  Failing  to  ensure  the  proper  monitoring  and  logging  of  network traffic;

c. Failing to ensure the proper monitoring and logging of file access and modifications;

d. Failing to ensure the proper training of employees as to cybersecurity best practices;

e. Failing to ensure fair, reasonable, or adequate computer systems and data  security  practices  to  safeguard  the  PII  of  Plaintiffs  and  Class Members;

f. Failure to timely and accurately disclose that Plaintiffs' and Class Members' PII had been improperly acquired or accessed;

g. Knowingly disregarding standard information security principles by allowing inadequate security measures;

h. Failing to provide adequate supervision and oversight of the PII with which they were entrusted.

60.     Upon  information  and  belief,  Defendant  further  failed  to  ensure  the  proper implementation of sufficient processes to quickly detect and respond to data security incidents, to ensure the proper encryption of Plaintiffs' and Class Members' PII, and to monitor user behavior and activity to identify possible threats.

61.     Time is of the essence when PII is subject to unauthorized access and/or acquisition.

62.     The disclosed, accessed, and/or acquired PII of Plaintiffs and Class Members is, upon information and good faith belief, already available on the Dark Web.

63.     Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals.

64.     Plaintiffs and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the publication of their PII onto the Dark Web.

65.     Plaintiffs and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

66.     Despite the highly sensitive nature of the information that Defendant obtained, maintained, and stored and the prevalence of data breaches, Defendant inexplicably failed to take appropriate steps to safeguard the PII of Plaintiffs and Class Members from being compromised.

67.     The Data Breach itself, and information Defendant has disclosed about the breach to date, including its length, the need to remediate Defendant's cybersecurity, and the sensitive nature of the impacted data collectively demonstrate Defendant failed to implement reasonable measures to prevent cyber-attacks and exposure of the PII it oversaw.

**D.  Defendant Failed to Comply with FTC Guidelines.**

68.     The FTC recognizes that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types

and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."9

69.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

70.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for business.

71.     Those guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.10

72.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.11

73.     The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.

---

9 Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable (last accessed Nov. 25, 2025).
10     *Protecting    Personal    Information:    A    Guide    for    Business* (2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed Nov. 25, 2025).
11*Start with Security: A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed Nov. 25, 2025).

74.     According to the FTC, reasonable data security protocols require:

a.      Encrypting the information stored on computer networks;

b.      Retaining payment card information only as long as necessary;

c.      Properly disposing of personal information that is no longer needed or can be disposed pursuant to relevant state and federal laws;

d.      Limiting administrative access to business systems;

e.      Using industry approved activity;

f.      Monitoring activity on networks to uncover unapproved activity;

g.      Verifying that privacy and security features function properly;

h.      Testing for common vulnerabilities; and

i.      Updating and patching third-party software.[12]

75.     The FTC cautions businesses that failure to protect PII and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[13] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures-like Defendant failed to do here-as an unfair act prohibited by Section 5(a) of the FTC Act.

76.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act of practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

---

[12] *Id.*
[13] *See Taking Charge, What to Do if Your Identity is Stolen*, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last accessed Nov. 25, 2025).

77.     Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

78.     Defendant failed to properly implement basic data security practices.

79.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer's PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

80.     Defendant was at all times fully aware of the obligation to protect the PII of its clients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**E.  Defendant Failed to Comply with Industry Standards.**

81.     As shown above, experts studying cybersecurity routinely identify large companies like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which it collects and maintains.

82.     Several best practices have been identified that at a minimum should be implemented by companies like Defendant, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limited which employees can access sensitive data.

83.     The United States Government and the United States Cybersecurity & Infrastructure Agency recommend several similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implement an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls,

automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

84.     Other best cybersecurity practices include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

85.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1[14] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet's Critical Security Controls[15] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

86.     The FBI's Internet Crime Complaint (IC3) 2019 estimated that there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone. That same report identified "rapid reporting" as a tool to help law enforcement stop fraudulent transactions and mitigate losses.

87.     The foregoing frameworks are existing and applicable industry standards, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

---

[14] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity* (2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf (last accessed Nov. 25, 2025).
[15] *See The 18 CIS Critical Security Controls*, https://www.cisecurity.org/controls/cis-controls-list (last accessed Nov. 25, 2025).

**F.  The Data Breach Resulted from Defendant's Failure to Properly Maintain and Safeguard Its Systems and Data.**

88.    Defendant breached its obligations to Plaintiffs and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data.

89.    Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.  Failing to adequately protect clients' PII;

    c.  Failing to properly monitor its own data security systems for existing intrusions;

    d.  Failing to ensure that its vendors with access to its computer systems employed reasonable security procedures;

    e.  Failing to detect unauthorized ingress into its systems;

    f.  Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

    g.  Failing to detect unauthorized exfiltration of the most sensitive data on its systems;

    h.  Failing to train its employees in the proper handling of emails containing PII and maintain adequate email security practices;

    i.  Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act; and

    j.  Otherwise breaching their duties and obligations to protect Plaintiffs' and Class Members' PII.

90.     Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' PII. Accordingly, as outlined below, Plaintiffs and Class Members now face actual fraud and identity theft as well as increased risk of fraud and identity theft. In addition, Plaintiffs and Class Members lost the benefit of the bargain they made with Defendant.

**G. Cyberattacks and Data Breaches Cause Disruption and Put Victims at an Increased Risk of Fraud and Identity Theft.**

91.     Cyberattacks and data breaches at companies like Defendant's are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

92.     The United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[16]

93.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it.

94.     They do this by selling the spoils of their cyberattacks on the black market to identify thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate piece of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim.

---

[16] *See* GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 2 (2007), https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last accessed Nov. 25, 2025).

95.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique called "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security Number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

96.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steal their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[17]

97.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

98.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

99.     In addition, thieves may obtain a job using the victim's Social Security Number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an issued victim's name.

---

[17] *See IdentityTheft.gov/Steps,* "https://www.identitytheft.gov/steps" (last accessed Nov. 25, 2025).

100.    Moreover, theft of PII is also gravely serious because PII is an extremely valuable property right.[18]

101.    Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.[19]

102.    There may additionally be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when PII and/or financial information is stolen and when it is used.

103.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[20]

104.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black- market" for years.

105.    There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and

---

[18] *See, e.g.,* John T. Soma *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets,* 15 Rich J.L. & Tech. 11, at 3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets." (citations omitted).
[19] *Id.*
[20] *The GAO Report*, at 29.

Class Members are at an increased risk of fraud and identity theft for the remainder of their lifetimes.

106.    Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for the remainder of their lifetimes.

107.    PII is particularly valuable because criminals can use it to target victims with various types of fraud and scams. Once PII is stolen, fraudulent use of the information and damage to victims may continue for years.

108.    For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[21] Such fraud may go undetected until debt collection calls commence months, or even years, later.

109.    Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.

110.    Each of these fraudulent activities is difficult to detect.

111.    Moreover, "SSNs have been central to the American identity infrastructure for years, being used as a key identifier[.] . . . U.S. banking processes have also had SSNs baked into their identification process for years. In fact, SSNs have been the gold standard for identifying and verifying the credit history of prospective customers."[22]

112.    "Despite the risk of fraud associated with the theft of Social Security numbers, just five of the nation's largest 25 banks have stopped using the numbers to verify a customer's identity

---

[21] *Identity Theft and Your Social Security Number* (2021), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed Nov. 25, 2025).
[22] *See*  https://www.americanbanker.com/opinion/banks-need-to-stop-relying-on-social-security-numbers (last accessed Nov. 25, 2025).

after the initial account setup[.]"[23] Accordingly, since Social Security numbers are frequently used to verify an individual's identity after logging onto an account or attempting a transaction, "[h]aving access to your Social Security number may be enough to help a thief steal money from your bank account"[24]

113.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[25]

114.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

115.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other

---

[23]    *See*   https://archive.nytimes.com/bucks.blogs.nytimes.com/2013/03/20/just-5-banks-prohibit-use-of-social-security-numbers/ (last accessed Nov. 25, 2025).

[24]    *See*  https://www.credit.com/blog/5-things-an-identity-thief-can-do-with-your-social-security-number-108597/ (last accessed Nov. 25, 2025).

[25] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/ (last accessed Nov. 25, 2025).

words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a "Fullz" package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

116.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

117.    Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

118.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

119.    An individual may not know that their Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud.

120.    Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

121.    Moreover, it is not an easy task to change or cancel a stolen Social Security number.

122.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse.

123.    Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[26]

124.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[27]

125.    For this reason, Defendant knew or should have known about these dangers and strengthened its data systems and data security measures accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## H.  Plaintiffs' and Class Members' Damages.

126.    Plaintiffs and Class Members have been damaged by the compromise of their PII in the Data Breach.

127.    Plaintiffs' and Class Members' PII was compromised in the Data Breach and is now in the hands of cybercriminals who accessed the data Defendant held required and maintained. The PII exposed included names, addresses, passport scans, IDs, Social Security Numbers, financial account information, employees' worksites and hours worked, customer lists, test results,

---

[26] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back* (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identtiy-theft (last accessed Nov. 25, 2025).
[27] Tim Greene, *Anthem hack: Personal Data stolen sells for 10x price of stolen credit card numbers* (Feb 6. 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last accessed Nov. 25, 2025).

and other private information belonging to Defendant's current and former clients, job applicants, and employees.

128.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

129.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach, valuable time Plaintiffs and Class Members otherwise would have spent on other activities, including but not limited to work and/or recreation.

130.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. This risk is particularly acute for minor children whose pristine credit histories and unused Social Security numbers make them prime targets for synthetic identity theft that may go undetected for years or even decades.

131.    Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to more effectively target such schemes to Plaintiffs and Class Members.

132.    Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

133.    Plaintiffs and Class Members also suffered a loss of value of their PII when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

134.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members who are current or former clients of Defendant's, or who otherwise submitted their data to Defendant, overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards.

135.    Part of the price Plaintiffs and Class Members paid to Defendant was intended to be used by Defendant to fund adequate data security practices to safeguard Plaintiffs' and Class Members' PII.

136.    As demonstrated by the Data Breach, Defendant failed to fund and provide adequate data security practices. Thus, Plaintiffs and the Class Members who are current or former clients of Defendant did not get what they paid for and agreed to.

137.    Plaintiffs and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably spent to remedy or mitigate the effects of the Data Breach relating to:

    a.  Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

    b.  Purchasing credit monitoring and identity theft prevention;

    c.  Placing "freezes" and "alerts" with reporting agencies;

    d.  Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

    e.  Contacting financial institutions and closing or modifying financial accounts; and,

f.  Closely reviewing and monitoring their medical insurance accounts, bank accounts, and credit reports, as well as alerts for identity fraud including their SSNs, for unauthorized activity for the remainder of their lifetimes.

138.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing PII is not accessible online or otherwise to unauthorized third parties.

139.    Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their PII—which contains the most intimate details about a person's life–may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

140.    As a direct and proximate result of Defendant's actions and omissions, Plaintiffs and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## REPRESENTATIVE PLAINTIFFS' EXPERIENCES

*Mary Brooks*

141.    Plaintiff Mary Brooks used Manpower in 2023 to obtain employment, and she provided her PII to Manpower for that purpose.

142.    Plaintiff Brooks understood that Manpower would safeguard her PII from unauthorized access, and she would not have provided her PII to Manpower if she had known its data security measures were inadequate.

143.    At the time of the Data Breach, Defendant retained Plaintiff Brooks' PII in its systems without reasonable data security.

144.    Plaintiff Brooks takes reasonable measures to protect her PII. She has never knowingly transmitted her PII unencrypted over the internet or other unsecured source. Plaintiff Brooks stores any documents containing her PII in a safe and secure location and diligently chooses unique usernames and passwords for her online accounts.

145.    Plaintiff Brooks' PII was compromised and disclosed as a result of Defendant's Data Breach.

146.    Plaintiff Brooks received a Data Breach Notice from Defendant dated August 11, 2025, informing her that her PII was taken from Defendant's systems between December 29, 2024 and January 12, 2025 and that the PII stolen included her name, Social Security number, and driver's license number.

147.    The Data Breach Notice came too late as Plaintiff Brooks was alerted by Chase Bank in January 2025 that her Social Security number was found on the dark web. This resulted in Plaintiff Brooks contacting Chase to discuss the dark web notification and then closing her Chase account and debit cards.

148.    As a result of the Data Breach, Plaintiff Brooks has lost at least five hours of her time reviewing her credit report and financial statements for fraudulent and suspicious activity, contacting Chase Bank to deal with the dark web notification, and researching the breach. This is a loss of valuable time she could have spent on other activities, including leisure and work. She continues to spend a considerable amount of time dealing with the impacts of the Data Breach.

149.    Plaintiff Brooks also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant

for the purpose of obtaining services from Defendant, which was compromised in and as a result of the Data Breach.

150.    Plaintiff Brooks suffered anxiety and increased fear of identity theft and fraud because of the Data Breach and knowing that her Social Security number has already been listed on the dark web.

151.    Plaintiff Brooks has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of criminals.

152.    Plaintiff Brooks suffered actual injury from having her sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

153.    Defendant obtained and continues to maintain Plaintiff Brooks' PII in a reckless manner, and Plaintiff Brooks has a continuing interest in ensuring that Defendant protects her PII from unauthorized access and disclosure.

### Sara Conrad

154.    Plaintiff Sara Conrad is a former employee of Manpower, who was required to provide extensive private information as a condition of employment.

155.    Plaintiff Conrad provided her PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

156.     According to the notice Plaintiff Conrad received from Manpower dated August 11, 2025, her PII was compromised in the Data Breach.

157.     Plaintiff Conrad reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard her PII from unauthorized users or disclosure, and would timely notify her of any data security incidents.

158.     Plaintiff Conrad is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Conrad stores any documents containing sensitive information in a safe and secure location or destroys the documents.

159.     As a result of the Data Breach, Plaintiff Conrad has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

160.     Plaintiff Conrad has spent significant time responding to the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

161.     Plaintiff Conrad suffered actual injury from having her sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

162.     Due to the Data Breach and the significant delay in notification, Plaintiff Conrad anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

163.     Since the Data Breach, Plaintiff Conrad is particularly concerned about the exposure of her Social Security number to criminal actors, as this number will always be tied to her identity and can be used to commit various types of fraud and identity theft for the remainder of her lifetime.

164.     As a result of the Data Breach, Plaintiff Conrad has experienced increased anxiety, stress, and fear knowing that her PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

165.     Plaintiff Conrad has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

### *Christine Cooper*

166.     Plaintiff Christine Cooper utilized Defendant's staffing services in connection with seeking employment, at which time she was required to provide extensive private information as a condition of receiving placement services.

167.     Plaintiff Christine Cooper provided her PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

168.     According to the notice Plaintiff Christine Cooper received from Manpower dated August 11, 2025, her PII was compromised in the Data Breach.

169.     Plaintiff Christine Cooper reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard her PII from unauthorized users or disclosure, and would timely notify her of any data security incidents.

170.     Plaintiff Christine Cooper is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Christine Cooper stores any documents containing sensitive information in a safe and secure location or destroys the documents.

171.     As a result of the Data Breach, Plaintiff Christine Cooper has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

172.     Plaintiff Christine Cooper has spent significant time responding to the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

173.     Plaintiff Christine Cooper suffered actual injury from having her sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

174.     Due to the Data Breach and the significant delay in notification, Plaintiff Christine Cooper anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

175.     Since the Data Breach, Plaintiff Christine Cooper is particularly concerned about the exposure of her Social Security number to criminal actors, as this number will always be tied to her identity and can be used to commit various types of fraud and identity theft for the remainder of her lifetime.

176.     As a result of the Data Breach, Plaintiff Christine Cooper has experienced increased anxiety, stress, and fear knowing that her PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

177.     Plaintiff Christine Cooper has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

***Fredrick Cooper***

178.     Plaintiff Fredrick Cooper utilized Defendant's staffing services in connection with seeking employment, at which time he was required to provide extensive private information as a condition of receiving placement services.

179.     Plaintiff Fredrick Cooper provided his PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

180.     According to the notice Plaintiff Fredrick Cooper received from Manpower dated August 11, 2025, his PII was compromised in the Data Breach.

181.     Plaintiff Fredrick Cooper reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard his PII from unauthorized users or disclosure, and would timely notify his of any data security incidents.

182.     Plaintiff Fredrick Cooper is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Fredrick Cooper stores any documents containing sensitive information in a safe and secure location or destroys the documents.

183.     As a result of the Data Breach, Plaintiff Fredrick Cooper has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft. Following receipt of the Notice, Plaintiff Fredrick Cooper received notices that his Private Information was on the dark web. He pulled his credit report and saw several credit inquiries from businesses that were unknown to him. Plaintiff Fredrick Cooper has taken steps to research and remove any such inquiries from his credit report.

184.     Plaintiff Fredrick Cooper has spent significant time responding to the Data Breach and will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation.

185.     Plaintiff Fredrick Cooper suffered actual injury from having his sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

186.     Plaintiff Fredrick Cooper also experienced fraudulent charges on his checking account, the same account utilized for his paycheck deposits from Defendant. He had to get a new account number and debit card after an unauthorized actor charged approximately $30 to his account. He also noticed an increase in calls and emails regarding loan inquiries, although Plaintiff Fredrick Cooper had not been applying for any loans. Plaintiff traces these issues to Defendant's Data Breach, given the exposure of his Social Security Number and banking information—both of which were in Defendant's possession at the time of the Data Breach, and timing of the incidents.

Plaintiff Fredrick Cooper has concerns that these issues will continue to happen, given the exposure of his Private Information.

187.     Due to the Data Breach and the significant delay in notification, Plaintiff Fredrick Cooper anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

188.     Since the Data Breach, Plaintiff Fredrick Cooper is particularly concerned about the exposure of his Social Security number to criminal actors, as this number will always be tied to his identity and can be used to commit various types of fraud and identity theft for the remainder of his lifetime.

189.     As a result of the Data Breach, Plaintiff Fredrick Cooper has experienced increased anxiety, stress, and fear knowing that his PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

190.     Plaintiff Fredrick Cooper has a continuing interest in ensuring that his PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

***Amy Doublin***

191.     Plaintiff Amy Doublin utilized Defendant's staffing services in connection with seeking employment, at which time she was required to provide extensive private information as a condition of receiving placement services.

192.     Plaintiff Doublin provided her PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

193.     According to the notice Plaintiff Doublin received from Manpower dated August 11, 2025, her PII was compromised in the Data Breach.

194.    Plaintiff Doublin reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard her PII from unauthorized users or disclosure, and would timely notify her of any data security incidents.

195.    Plaintiff Doublin is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Doublin stores any documents containing sensitive information in a safe and secure location or destroys the documents.

196.    As a result of the Data Breach, Plaintiff Doublin has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

197.    Plaintiff Doublin has spent significant time responding to the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

198.    Plaintiff Doublin suffered actual injury from having her sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

199.    Due to the Data Breach and the significant delay in notification, Plaintiff Doublin anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

200.    Since the Data Breach, Plaintiff Doublin is particularly concerned about the exposure of her Social Security number to criminal actors, as this number will always be tied to her

identity and can be used to commit various types of fraud and identity theft for the remainder of her lifetime.

201.     As a result of the Data Breach, Plaintiff Doublin has experienced increased anxiety, stress, and fear knowing that her PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

202.     Plaintiff Doublin has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

### Deanna Ghinelli

203.     Plaintiff Deanna Ghinelli utilized Defendant's staffing services in connection with seeking employment, at which time she was required to provide extensive private information as a condition of receiving placement services.

204.     Plaintiff Ghinelli provided her PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

205.     According to the notice Plaintiff Ghinelli received from Manpower dated August 11, 2025, her PII was compromised in the Data Breach.

206.     Plaintiff Ghinelli reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard her PII from unauthorized users or disclosure, and would timely notify her of any data security incidents.

207.     Plaintiff Ghinelli is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Ghinelli stores any documents containing sensitive information in a safe and secure location or destroys the documents.

208.     As a result of the Data Breach, Plaintiff Ghinelli has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

209.     Plaintiff Ghinelli has spent significant time responding to the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

210.     Plaintiff Ghinelli suffered actual injury from having her sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

211.     Due to the Data Breach and the significant delay in notification, Plaintiff Ghinelli anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

212.     Since the Data Breach, Plaintiff Ghinelli is particularly concerned about the exposure of her Social Security number to criminal actors, as this number will always be tied to her identity and can be used to commit various types of fraud and identity theft for the remainder of her lifetime.

213.     As a result of the Data Breach, Plaintiff Ghinelli has experienced increased anxiety, stress, and fear knowing that her PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

214.     Plaintiff Ghinelli has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

*Shanna Harmon*

215.    Plaintiff Shanna Harmon utilized Defendant's staffing services in connection with seeking employment, at which time she was required to provide extensive private information as a condition of receiving placement services.

216.    Plaintiff Harmon provided her PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

217.    According to the notice Plaintiff Harmon received from Manpower dated August 11, 2025, her PII was compromised in the Data Breach.

218.    Plaintiff Harmon reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard her PII from unauthorized users or disclosure, and would timely notify her of any data security incidents.

219.    Plaintiff Harmon is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Harmon stores any documents containing sensitive information in a safe and secure location or destroys the documents.

220.    As a result of the Data Breach, Plaintiff Harmon has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

221.    Plaintiff Harmon has spent significant time responding to the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

222.     Plaintiff Harmon suffered actual injury from having her sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

223.     Due to the Data Breach and the significant delay in notification, Plaintiff Harmon anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

224.     Since the Data Breach, Plaintiff Harmon is particularly concerned about the exposure of her Social Security number to criminal actors, as this number will always be tied to her identity and can be used to commit various types of fraud and identity theft for the remainder of her lifetime.

225.     As a result of the Data Breach, Plaintiff Harmon has experienced increased anxiety, stress, and fear knowing that her PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

226.     Plaintiff Harmon has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

***Courtney Howard***

227.     Plaintiff Courtney Howard utilized Defendant's staffing services in connection with seeking employment, at which time she was required to provide extensive private information as a condition of receiving placement services.

228.     Plaintiff Howard provided her PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly

given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

229.    According to the notice Plaintiff Howard received from Manpower dated August 11, 2025, her PII was compromised in the Data Breach.

230.    Plaintiff Howard reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard her PII from unauthorized users or disclosure, and would timely notify her of any data security incidents.

231.    Plaintiff Howard is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Howard stores any documents containing sensitive information in a safe and secure location or destroys the documents.

232.    As a result of the Data Breach, Plaintiff Howard has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

233.    Plaintiff Howard has spent significant time responding to the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

234.    Plaintiff Howard suffered actual injury from having her sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

235.    Due to the Data Breach and the significant delay in notification, Plaintiff Howard anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

236.    Since the Data Breach, Plaintiff Howard is particularly concerned about the exposure of her Social Security number to criminal actors, as this number will always be tied to her identity and can be used to commit various types of fraud and identity theft for the remainder of her lifetime.

237.    As a result of the Data Breach, Plaintiff Howard has experienced increased anxiety, stress, and fear knowing that her PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

238.    Plaintiff Howard has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

***Lorna Lane***

239.    Plaintiff Lorna Lane utilized Defendant's staffing services in connection with seeking employment, at which time she was required to provide extensive private information as a condition of receiving placement services.

240.    Plaintiff Lane provided her PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

241.    According to the notice Plaintiff Lane received from Manpower dated August 11, 2025, her PII was compromised in the Data Breach.

242.    Plaintiff Lane reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard her

PII from unauthorized users or disclosure, and would timely notify her of any data security incidents.

243.    Plaintiff Lane is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Lane stores any documents containing sensitive information in a safe and secure location or destroys the documents.

244.    As a result of the Data Breach, Plaintiff Lane has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

245.    Plaintiff Lane has spent significant time responding to the Data Breach and will continue to spend valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation.

246.    Plaintiff Lane suffered actual injury from having her sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

247.    Due to the Data Breach and the significant delay in notification, Plaintiff Lane anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

248.    Since the Data Breach, Plaintiff Lane is particularly concerned about the exposure of her Social Security number to criminal actors, as this number will always be tied to her identity

and can be used to commit various types of fraud and identity theft for the remainder of her lifetime.

249.     As a result of the Data Breach, Plaintiff Lane has experienced increased anxiety, stress, and fear knowing that her PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

250.     Plaintiff Lane has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

### *Latoya Middleton*

251.     Plaintiff Latoya Middleton utilized Defendant's staffing services in connection with seeking employment opportunities in 2018, at which time she was required to provide extensive personal and financial information as a condition of receiving placement services.

252.     As a condition of receiving staffing services from Manpower, Plaintiff Middleton was required to provide her PII and other private information to Defendant for employment verification, background check, and payroll purposes, including but not limited to, her name, address, Social Security number, date of birth, driver's license number, employment history, and banking information.

253.     Plaintiff Middleton provided this PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

254.     According to the notice Plaintiff Middleton received from Manpower dated August 11, 2025, Plaintiff Middleton's PII was compromised in the Data Breach.

255.     Plaintiff Middleton reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard her

PII from unauthorized users or disclosure, and would timely notify her of any data security incidents.

256.    Plaintiff Middleton had no choice but to provide her information to Defendant as it was mandatory for receiving staffing services, and she relied on Defendant's representations regarding data security.

257.    Plaintiff Middleton is very careful about sharing her sensitive PII. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Middleton stores any documents containing sensitive information in a safe and secure location or destroys the documents.

258.    As a result of the Data Breach, Plaintiff Middleton has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

259.    Plaintiff Middleton has spent significant time responding to the Data Breach and will continue to spend valuable time they otherwise would have spent on other activities, including but not limited to work and/or recreation.

260.    Plaintiff Middleton suffered actual injury from having them sensitive information exposed and/or stolen as a result of the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

261.    Due to the Data Breach and the significant delay in notification, Plaintiff Middleton anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

262.    Since the Data Breach, Plaintiff Middleton is particularly concerned about the exposure of her Social Security number to criminal actors, as this number will always be tied to her identity and can be used to commit various types of fraud and identity theft for the remainder of her lifetime.

263.    Plaintiff Middleton has experienced increased anxiety, stress, and fear knowing that her PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

264.    Plaintiff Middleton has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

### Christopher Platter

265.    Plaintiff Christopher Platter utilized Defendant's staffing services in connection with seeking employment, at which time he was required to provide extensive private information as a condition of receiving placement services.

266.    Plaintiff Platter provided his PII with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure, particularly given that Defendant was legally obligated to safeguard applicant and employee records under federal and state employment laws.

267.    According to the notice Plaintiff Platter received from Manpower dated August 11, 2025, his PII was compromised in the Data Breach.

268.    Plaintiff Platter reasonably expected and understood that Defendant would implement, at a minimum, industry standard precautions to protect, maintain, and safeguard his

PII from unauthorized users or disclosure, and would timely notify his of any data security incidents.

269.    Plaintiff Platter is very careful about sharing his sensitive PII. He has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff Platter stores any documents containing sensitive information in a safe and secure location or destroys the documents.

270.    As a result of the Data Breach, Plaintiff Platter has made reasonable efforts to mitigate the impact, including researching the Data Breach, reviewing financial statements, monitoring credit information, and remaining vigilant for signs of identity theft.

271.    Plaintiff Platter has spent significant time responding to the Data Breach and will continue to spend valuable time he otherwise would have spent on other activities, including but not limited to work and/or recreation.

272.    Plaintiff Platter suffered actual injury from having his sensitive information exposed and stolen in the Data Breach including, but not limited to: (a) damages to and diminution in the value of them PII; (b) loss of privacy; (c) continuous imminent and impending injury arising from the increased risk of financial and identity fraud and theft; (d) lost time and expenses to engage in mitigation efforts; and (e) dealing with increasing spam calls, texts, and emails.

273.    Due to the Data Breach and the significant delay in notification, Plaintiff Platter anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach.

274.    Since the Data Breach, Plaintiff Platter is particularly concerned about the exposure of his Social Security number to criminal actors, as this number will always be tied to his identity and can be used to commit various types of fraud and identity theft for the remainder of his lifetime.

275.    As a result of the Data Breach, Plaintiff Platter has experienced increased anxiety, stress, and fear knowing that his PII is in the hands of ransomware criminals who have demonstrated their willingness to exploit such data for financial gain.

276.    Plaintiff Platter has a continuing interest in ensuring that his PII, which remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

277.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated.

278.    Plaintiffs seek to represent a class of persons defined as follows:

> All individuals residing in the United States whose PII was compromised by the Data Breach (the "Class").

279.    The following people are excluded from the Class: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant or its parent has a controlling interest, and its current or former officers and directors; (iii) persons who properly execute and file a timely request for exclusion from the Class; (iv) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (v) Plaintiffs' counsel and Defendant's counsel; and (vi) the legal representatives, successors, and assigns of any such excluded persons.

280.    Numerosity: The exact number of members of the Class is unknown but, upon information and belief, it is estimated to number in the tens or hundreds of thousands at this time, and individual joinder in this case is impracticable. Members of the Class can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily

used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

281.    Typicality: Plaintiffs' claims are typical of the claims of other members of the Class in that Plaintiffs, and the members of the Class, sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiffs and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

282.    Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiffs have no interests that conflict with, or are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiffs.

283.    Commonality and Predominance: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

   a.  Whether Defendant violated the laws asserted herein, including statutory privacy laws;

   b.  Whether Defendant had a duty to use reasonable care to safeguard Plaintiffs' and Class Members' PII;

   c.  Whether Defendant breached the duty to use reasonable care to safeguard Plaintiffs' and Class Members' PII;

   d.  Whether Defendant breached its contractual promises to safeguard Plaintiffs' and Class Members' PII;

e.   Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing PII;

f.   Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiffs' and Class Members' PII from unauthorized release and disclosure;

g.   Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiffs' and Class Members' PII from unauthorized release and disclosure;

h.   Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

i.   Whether Defendant's method of informing Plaintiffs and other members of the Class was unreasonable;

j.   Whether Defendant's conduct was likely to deceive the public;

k.   Whether Defendant is liable for negligence or gross negligence;

l.   Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the PII violated applicable state laws;

m.   Whether Plaintiffs and Class Members were injured as a proximate cause or result of the Data Breach;

n.   Whether Plaintiffs and members of the Class were damaged as a proximate cause of the Data Breach;

o.   Whether Defendant's practices and representations related to the Data Breach  breached implied contracts with Plaintiffs and members of the Class;

p.   What the proper measure of damages is; and

q.  Whether Plaintiffs and members of the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

284.    <u>Superiority</u>: This cause is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

285.    A class action is superior to individual litigation because:

a.  The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedural device;

b.  Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c.  The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

286.  Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.  Whether Defendant failed to timely and adequately notify the public of the Data Breach;

b.  Whether Defendant owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.  Whether Defendant's security measures to protect its data systems were  reasonable in light of best practices recommended by data security experts;

d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard PII in its possession; and

f.  Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

287.  Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
#### NEGLIGENCE
#### *(On Behalf of Plaintiffs & the Class)*

288.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-287 as if fully set forth herein.

289.    Defendant required Plaintiffs and Class Members to provide their PII to work with or receive employment, employment placing, or staffing services from Defendant.

290.    By collecting and storing this data in its computer system and network, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer system—and Plaintiffs' and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems reasonably quickly and to give prompt notice to those affected in the case of a data breach.

291.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, the personnel responsible for them, and its information technology partners adequately protected the PII.

292.    Plaintiffs and the Class are a well-defined, foreseeable, and probable group of clients and employees that Defendant was aware, or should have been aware, could be injured by its inadequate data security measures.

293.    A large repository of highly valuable personal information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information. Defendant knew or

should have known that, given its repository of a host of PII for thousands of clients posed a significant risk of being targeted for a data breach. Thus, Defendant had a duty to reasonably safeguard Plaintiffs' and Class Members' data by implementing reasonable data security measures to protect against data breaches. The foreseeable harm to Plaintiffs and the Class of inadequate data security created a duty to act reasonably and safeguard the PII.

294. After all, PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members. Thus, Defendant knew, or should have known, the importance of exercising reasonable care in handling the PII entrusted to them.

295. Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and its clients, which is recognized by laws and regulations, as well as common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

296. In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.[28]

297. Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

---

[28] *See* 15 U.S.C. § 45.

298.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' PII;

b.  Failing to adequately monitor the security of its networks and systems;

c.  Failing to have in place mitigation policies and procedures;

d.  Allowing unauthorized access to Plaintiffs' and Class Members' PII;

e.  Failing to detect in a timely manner that Plaintiffs' and Class Members' PII had been compromised; and

f.  Failing to timely notify Plaintiffs and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

299.    Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiffs' and the Class Members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite the known risk of data breaches, and allowing unauthorized access to Plaintiffs' and Class Members' PII.

300.    The failure of Defendant to comply with industry standards and federal regulations evidences Defendant's negligence in failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' PII.

301.    But for Defendant's wrongful and negligent breach of its duties to Plaintiffs and Class Members, their PII would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the PII of Plaintiffs and Class Members and all resulting damages.

302.    It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiffs' and Class Members' PII would result in injury to Plaintiffs and Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

303.    It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' PII would result in one or more types of injuries to Plaintiffs and Class Members.

304.    As a result of this misconduct by Defendant, the PII of Plaintiffs and Class Members was compromised, placing them at a greater risk of identity theft and of their PII being disclosed to third parties without the consent of Plaintiffs and the Class.

305.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

306.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, e.g., (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiffs and all Class Members.

## SECOND CAUSE OF ACTION
### NEGLIGENCE *PER SE*
### *(On Behalf of Plaintiffs & the Class)*

307.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-287 as if fully set forth herein.

308.    Plaintiffs alleges this negligence *per se* theory in the alternative to Count I.

309.    Pursuant to the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, Defendant has a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII. Specifically, this statute prohibits "unfair . . .

practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.[29]

310.    Moreover, Plaintiffs and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions against businesses that—because of its failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Defendant inflicted upon Plaintiffs and Class Members.

311.    Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect PII.

312.    Defendant owed Plaintiffs and Class Members a duty to notify them within a reasonable time frame of any breach to their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of Defendant's Data Breach.

313.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Defendant actively sought and obtained the PII of Plaintiffs and Class Members.

314.    Defendant breached its duties to Plaintiffs and Class Members under the FTCA by failing to provide fair, reasonable, or adequate computer systems and data security practices

---

[29] *See id.*

to safeguard Plaintiffs' and Class Members' PII. And but for Defendant's negligence, Plaintiffs and Class Members would not have been injured. The specific negligent acts and omissions committed by Defendant include, but are not limited to:

a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' PII:

b.  Failing to comply with—and thus violating—FTCA and its regulations;

c.  Failing to adequately monitor the security of its networks and systems;

d.  Failing to have in place mitigation policies and procedures;

e.  Allowing unauthorized access to Plaintiffs' and Class Members' PII;

f.  Failing to detect in a timely manner that Plaintiffs' and Class Members' PII had been compromised; and

g.  Failing to timely notify Plaintiffs and Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

315.    Defendant's failure to comply with applicable laws and regulations constitutes negligence *per se*.

316.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

317.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that Defendant's breach would cause Plaintiffs and Class Members to experience the foreseeable harms associated with the exposure of their PII.

318.    Simply put, Defendant's negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injuries-in-fact and damages. These injuries include, but are not

limited to, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

319.    As a direct and proximate result of Defendant's negligent conduct, Plaintiffs and Class Members have suffered injury and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

320.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiffs and all Class Members.

### THIRD CAUSE OF ACTION
#### INVASION OF PRIVACY
#### *(On Behalf of Plaintiffs & the Class)*

321.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-287 as if fully set forth herein.

322.    Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

323.    Defendant owed a duty to its clients, including Plaintiffs and the Class, to keep this information confidential.

324.    Defendant's Data Breach, which resulted in the unauthorized acquisition (*i.e.*, theft) by a third party of Plaintiffs and Class Members' PII is highly offensive to a reasonable person.

325.    The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class disclosed their sensitive and confidential information to Defendant as part of their employment or other relationship, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

326.    The Data Breach constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, both as to their person and as to their private affairs and concerns, of a kind that would be highly offensive to a reasonable person.

327.    Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate, knew that the PII in its possession would be an attractive target to cybercriminals, and then knowingly failed to take any action to implement measures reasonably designed to protect the PII.

328.    Defendant further acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

329.    Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

330.    As a proximate result of Defendant's intentional acts and omissions, the PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and rediscosure without authorization, causing Plaintiffs and the Class to suffer damages.

331.    Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class

because their PII are still maintained by Defendant with their inadequate cybersecurity system and policies.

332.    Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

333.    In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

### FOURTH CAUSE OF ACTION
#### BREACH OF IMPLIED CONTRACT
#### *(On Behalf of Plaintiffs & the Class)*

334.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-287 as if fully set forth herein.

335.    Defendant required Plaintiffs and Class Members to provide and entrust their PII to it as a condition of obtaining services from Defendant and/or obtaining employment with Defendant.

336.    Plaintiffs and Class Members paid money to Defendant, directly and/or indirectly, in exchange for goods and/or services as well as Defendant's promise to protect their PII from unauthorized disclosure.

337.    Upon entering into staffing or employment agreements with Plaintiffs and Class Members, Defendant promised to comply with legal and industry standards and to make sure that Plaintiffs' and Class Members' PII would remain protected.

338.    Implicit in the agreement between Defendant and Plaintiffs and Class Members was the obligation that Defendant would maintain the PII confidentially and securely.

339.    Defendant had implied duties of good faith to ensure that the PII of Plaintiffs and Class Members in their possession was used and disclosed only as authorized.

340.    Defendant had implied duties to protect the PII of Plaintiffs and Class Members from unauthorized disclosure or uses.

341.    Additionally, Defendant implicitly promised to retain this PII only under conditions that kept such information secure and confidential.

342.    Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' PII.

343.    Defendant solicited and invited Plaintiffs and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

344.    Plaintiffs and Class Members fully performed their obligations under the implied contract with Defendant. Defendant did not. Plaintiffs and Class Members would not have provided their confidential PII to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their PII for uses other than obtaining benefits and services from Defendant.

345.    Defendant breached the implied contracts with Plaintiffs and Class Members by failing to safeguard and protect Plaintiffs' and Class Members' PII; failing to provide timely and accurate notice to Plaintiffs and Class Members that their PII was compromised as a result of the

Data Breach; and violating industry standards as well as legal obligations that are necessarily incorporated into implied contracts between Plaintiffs, Class Members, and Defendant.

346.    Defendant's failures to meet these promises constitute breaches of the implied contracts.

347.    Furthermore, the failure to meet its confidentiality and privacy obligations resulted in Defendant providing goods and services to Plaintiffs and Class Members that were of a diminished value.

348.    Defendant's acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiffs and Class Members to provide their PII in exchange for Defendant's services and employment benefits.

349.    As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiffs and Class Members have suffered (and will continue to suffer) (a) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the possibility of an illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non- economic harm.

350.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and Class Members are entitled to recover actual, consequential, and nominal damages.

**FIFTH CAUSE OF ACTION**
UNJUST ENRICHMENT
*(On Behalf of Plaintiffs & the Class)*

351.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1-287 as if fully set forth herein.

352.    This claim is pleaded solely in the alternative to Plaintiffs' breach of implied contract claim.

353.    Plaintiffs and Class Members conferred a monetary benefit on Defendant by working for or seeking services from Defendant. A portion of the proceeds of this benefit was intended to have been used by Defendant for data security measures to secure Plaintiffs and Class Members' PII. Plaintiffs and Class Members further conferred a benefit on Defendant by entrusting their PII to Defendant from which Defendant derived profits.

354.    Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

355.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

356.    Defendant acquired the monetary benefit and PII through inequitable means in that Defendant failed to disclose the inadequate security practices, as described herein, and failed to maintain adequate data security.

357.    If Plaintiffs and Class Members knew that Defendant had not secured their PII, they would not have agreed to give their money, services, or disclosed their valuable data to Defendant.

358.    Plaintiffs and Class Members have no adequate remedy at law.

359.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered—and will continue to suffer—a host of injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their PII is used; (3) the compromise, publication, and/or theft of their PII; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their possession; and (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Defendant's Data Breach.

360.     The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and data security practices alleged in this Complaint.

361.     Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all persons similarly situated, pray for judgment in them favor and against Defendant Manpower of Lansing, Michigan, Inc.,

and respectfully requests that this Honorable Court enter an order:

A.  certifying this action as a Class action and appointing Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.  granting equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.  granting equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII compromised during the Data Breach;

D.  granting equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.  requiring Defendant to pay for not less than five years of credit monitoring services for Plaintiffs and the Class;

F.  awarding actual damages, nominal damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.  awarding punitive damages, as allowable by law;

H.  awarding attorneys' fees and costs under the common fund doctrine, and any other applicable law;

I.  awarding costs and any other expenses, including expert witness fees, incurred by Plaintiffs in connection with this action;

J.  awarding pre- and post-judgment interest on any amounts awarded; and

K.  all such other and further relief as this court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 26, 2025

Respectfully submitted,

*/s/ Scott Edward Cole*
Scott Edward Cole
**COLE & VAN NOTE**
555 12th Street, Suite 2100
Oakland, California 94607
Telephone: (510) 891-9800
Email: sec@colevannote.com

*Interim Co-Lead Class Counsel*


*/s/ Gary Klinger*
Gary Klinger
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
Email: gklinger@milberg.com

*Interim Co-Lead Class Counsel*


Jeff Ostrow
**KOPELOWITZ OSTROW P.A.**
One West Law Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 332-4200
Email: ostrow@kolawyers.com


Leanna A. Loginov*
**SHAMIS & GENTILE P.A.**
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Telephone: (305) 479-2299
Email: lloginov@shamisgentile.com


Tyler J. Bean*
Gabrielle Williams*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Telephone: (212) 532-1091
Email: tbean@sirillp.com
Email: gwilliams@sirillp.com

*/s/ Gerald D. Wells, III*
Gerald D. Wells, III*
Stephen E. Connolly*
**LYNCH CARPENTER, LLP**
1133 Penn Ave., 5th Floor
Pittsburgh Pennsylvania 15222
Telephone: (412) 322-9243
Email: jerry@lcllp.com
Email: steve@lcllp.com

*Interim Co-Lead Class Counsel*


Gregory A. Mitchell (P68723)
E. Powell Miller (P39487)
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
Email: gam@millerlawpc.com
Email: epm@millerlawpc.com


William B. Federman*
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Telephone: (405) 235-1560
Fax: (405) 239-2112
Email: wbf@federmanlaw.com


Marc H. Edelson*
Liberato P. Verderame *
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N300
Newtown, PA 18940
Telephone: (215) 867-2399
Email: medelson@edelson-law.com
Email: lverderame@edelson-law.com


David S. Almeida*
**ALMEIDA LAW GROUP LLC**
849 W. Webster Ave.
Chicago, Illinois, 60614
Telephone: (708) 437-6476
Email: david@almeidalawgroup.com

Amber L. Schubert
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union St, Ste 200
San Francisco, CA 94123
Telephone.: 415-788-4220
Fax: 415-788-0161
Email: aschubert@sjk.law

Leigh S. Montgomery*
**ELLZEY KHERKHER SANFORD MONTGOMERY, LLP**
4200 Montrose Blvd., Suite 200
Houston, Texas 77006
Telephone: (888) 350-3931
Email: lmontgomery@eksm.com
Service only: service@eksm.com

*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing and its attachments were filed using the Court's CM/ECF system on November 26, 2025, which will provide service of same to all counsel of record.

/s/ Scott Edward Cole
Scott Edward Cole